1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10
11

CAROLE NICOLET,

                    Plaintiff,

CASE NO.     C05-5792RBL-KLS

12

        v.

REPORT AND
RECOMMENDATION

13
14

JO ANNE B. BARNHART, Commissioner of
Social Security,

Noted for March 9, 2007

15

                    Defendant.

16
17

18      Plaintiff, Carole Nicolet, has brought this matter for judicial review of the denial of her applications

19  for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred to

20  the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR

21  4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After

22  reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and

23  Recommendation for the Honorable Ronald B. Leighton's review.

24                        FACTUAL AND PROCEDURAL HISTORY

25      Plaintiff currently is sixty-five years old.[1] Tr. 66.  She has a high school education, has completed

26  more than one year of college course work, and has past work experience as a controller, an administrative

27

28

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

1   assistant, an office manager/secretary, a bookkeeper, and an auditor. Tr. 119, 124, 150, 741, 851, 868.

2        On July 7, 2000, plaintiff filed applications for disability insurance and SSI benefits, alleging

3   disability as of December 14, 1999, due to a deformed and herniated vertebra, pinched nerve tendonitis,

4   very poor circulation, severe depression, headaches, and pain in the back, hips, knees, shoulders, and arms.

5   Tr. 22, 99, 118, 555, 740.  Her applications were denied initially and on reconsideration. Tr. 66-67, 70,

6   559-60, 564-65, 740.

7        A hearing was held before an administrative law judge ("ALJ") on July 26, 2001, at which plaintiff,

8   represented by counsel, appeared and testified, as did a vocational expert and a lay witness. Tr. 32-65.  On

9   October 4, 2001, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically that

10  she was capable of returning to her past relevant work. Tr. 21-31.  On February 28, 2003, plaintiff's request

11  for review was denied by the Appeals Council. Tr. 8.  Plaintiff appealed to this Court, which, on December

12  23, 2003, remanded this matter back to the Commissioner. Tr. 754-55.

13       In the meantime, on March 31, 2003, plaintiff filed two more applications for disability insurance

14  and SSI benefits, again alleging disability as of December 14, 1999, due to depression, hip, back, knee, and

15  shoulder problems, asthma, headaches, sleep apnea, an irregular heartbeat, fibromyalgia, and other mental

16  and physical impairments. Tr. 740, 742, 842, 850, 1217.  Both applications were denied initially and on

17  reconsideration. Tr. 740, 785, 787, 792, 798, 1222, 1224-25.

18       On June 3, 2004, pursuant to the previous remand order regarding the applications plaintiff filed on

19  July 7, 2000, a second hearing was held before the same ALJ, at which plaintiff, represented by counsel,

20  appeared and testified, as did a vocational expert. Tr. 741, 1231-70.  A supplemental hearing also was held

21  on August 17, 2004, at which additional vocational expert testimony was taken. Tr. 1271-86.

22       On November 10, 2004, the ALJ issued a decision addressing both the applications plaintiff filed on

23  July 7, 2000, and those she filed on March 31, 2003, determining plaintiff to be not disabled, finding

24  specifically in relevant part:

25       (1)    at step one of the disability evaluation process,[2] plaintiff had not engaged in
        substantial gainful activity since her alleged onset date of disability;

26

27       (2)    at step two, plaintiff had "severe" impairments consisting of dysthymia,

28         [2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled.
        See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

degenerative disc disease, bilateral degenerative joint disease of the knees, epicondylitis, fibromyalgia, and apnea/asthma;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform a significant range of light work, with certain other non-exertional limitations, which precluded her from performing her past relevant work; and

(5)     at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 740, 752-53. Plaintiff's request for review was denied by the Appeals Council on October 26, 2005, making the ALJ's decision the Commissioner's final decision. Tr. 731; 20 C.F.R. § 404.981, § 416.1481.

On December 9, 2005, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#5). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in finding plaintiff's hand problems did not constitute a severe impairment;

(b)     the ALJ erred in evaluating the medical opinion source evidence in the record;

(c)     the ALJ erred in finding that none of her impairments met or equaled the criteria of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 (musculoskeletal system);

(d)     the ALJ erred in assessing plaintiff's credibility;

(e)     the ALJ erred in evaluating the lay witness evidence in the record;

(f)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(g)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson

v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Properly Found Plaintiff's Hand Impairment to Be Not Severe

At step two of the five-step sequential disability evaluation process, the ALJ must determine if an impairment is "severe."  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), ( c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is a de minimis screening device used to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

The ALJ rejected plaintiff's allegation that her hand problems constituted a severe impairment, pointing to a lack of any "objective evidence in the medical record, such as EMG testing or neurological examination results to show that the claimant has any medically determinable impairment that could reasonably cause her alleged hand symptoms of pain, tingling, numbness and poor grasping ability." Tr. 747. Specifically, the ALJ noted as follows:

> There is evidence that the claimant has cervical disc disease and some epicondilitis in her shoulder (Exhibit B-1F, pgs. 17 to 21), but there is no evidence that these impairments extend to the claimant's hands.  Other than simple repetitions of the claimant's complaints, the only mention of the claimant's hand problems in the medical evidence is a statement by an examining physician that a previous evaluation for carpal tunnel syndrome had been negative (Exhibits B-5F B-7F).

Id. In addition, the ALJ found that plaintiff's own description of her activities of daily living were "not

consistent with the activities of someone with severe level hand impairments," in that she did "a lot of" cooking, played cards, drove, and regularly did childcare for her grandchildren. Id.  The ALJ concluded, therefore, that plaintiff's alleged hand problems were "not a medically determinable impairment as defined by the Regulations." Id.

Plaintiff objects to the ALJ's determination that there is no objective evidence in the record that she has a medically determinable impairment.  She points to an early August 1991 neurologic consultation, in which the following clinical findings were made:

> Nerve conduction studies are performed of the right radial sensory, right median sensory, right ulnar sensory, right median motor, and right ulnar motor nerves.  These are all within the normal range.  However, the right median sensory, palmar latency is at the upper limits of normal, and there is a significant difference between this and the ulnar sensory palmar response.  This is consistent with a minimal right median neuropathy at the wrist.

Tr. 263-64 (emphasis added).  As can be seen, the above nerve conduction studies fell largely within the normal range, with only a "minimal" right median neuropathy noted at the wrist.  These hardly constitute significant clinical findings.  These studies, furthermore, were conducted more than eight years prior to plaintiff's alleged onset date of disability, and thus are of dubious relevance.

Plaintiff also points to physical therapy progress notes contained in the record, in which plaintiff indicated some symptoms of pain, numbness and loss of rotation in her right wrist, elbow and shoulder. See Tr. 946-51, 1013.  Other than some elicited pain to resistance that was recorded, however, those notes make no specific finding regarding a hand impairment. Id.  Further, a physical therapist is not an "acceptable medical source" as that term is defined in the Social Security Regulations, and thus the therapist's opinion may be given less weight than those of acceptable medical sources. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources").

Plaintiff further argues that her own statements show she was having pain, numbness and other hand-related symptoms.  A claimant's own statements regarding his or her symptoms and limitations, however, does not constitute objective medical evidence.  In addition, as discussed below, the ALJ did not err in finding plaintiff's testimony regarding her symptoms and limitations to be less than fully credible.  Similarly, while plaintiff's daughter may not have been found to suffer from the same credibility issues, again, her statements are not considered to be objective medical evidence of an impairment.

1    Plaintiff notes the record contains an examination performed in early October 2001, in which she

2    was found to have tenderness over her right epicondyle and forearm on examination, and in which she was

3    diagnosed with right shoulder and right arm pain. Tr. 629. Contrary to plaintiff's assertions, however, this

4    examination appears to have been performed by a nurse practitioner, and not a physician, and so again may

5    be given less weight than one performed by a medical doctor. See id. In addition, the only thing that this

6    examination shows is that plaintiff had tenderness in her right epicondyle and forearm. Indeed, testing of

7    her wrists and hands at that time revealed completely normal findings. Id.

8    Plaintiff argues that given the medical literature regarding epicondylitis she attaches to her opening

9    brief, it is clear that her allegations regarding her hand complaints were credible. Questions of credibility,

10   however, are solely within the control of the ALJ, which the Court should not "second guess." Sample v.

11   Schweiker, 694 F.2d 639, 642 (9th Cir. 1982); Allen, 749 F.2d at 580. Again, as discussed below, the ALJ

12   did not err in discounting plaintiff's credibility. Further, the ALJ may not base his decision on "his own

13   expertise." See Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on

14   meaning of objective medical findings without supporting medical expert testimony). For the same reason,

15   the Court should not rely on its own examination of objective clinical findings, or, in this case, the medical

16   literature, in determining whether the ALJ's decision is supported.

17   A review of the objective medical evidence in the record as a whole, furthermore, reveals the ALJ's

18   step two determination regarding plaintiff's alleged hand impairment is supported by substantial evidence.

19   While there is evidence of some right upper extremity pain and other symptoms, no acceptable medical

20   source in the record has diagnosed plaintiff with a hand impairment, or found that she had any work-related

21   limitations with respect to her hands. Indeed, in late May 2001, she reported that those symptoms were

22   only "mild" in nature, and x-rays of that area were negative at the time. Tr. 516-17. In addition, much of

23   the medical opinion evidence in the record reveals an almost total absence of actual limitations involving her

24   hands. See Tr. 232, 308, 320, 327, 330, 332, 334, 350, 449, 516-17. While one medical source did find

25   plaintiff to be limited in terms of reaching with her right upper extremity, that source specifically noted no

26   limitation with respect to handling or fingering. Tr. 1050.

27   II.    The ALJ's Analysis of the Medical Evidence in the Record

28   The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

1   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

2   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

3   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

4   be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

5   1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

6   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

7   "falls within this responsibility." Id. at 603.

8          In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

9   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

10  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

11  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

12  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

13  ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

14         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

15  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

16  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

17  legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

18  ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

19  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain

20  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

21  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

22         In general, more weight is given to a treating physician's opinion than to the opinions of those who

23  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

24  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

25  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

26  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

27  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

28  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

REPORT AND RECOMMENDATION
Page - 7

31; Tonapetyan, 242 F.3d at 1149.

A.   Dr. Davenport Kent

Plaintiff was evaluated by Dr. Marcia Davenport Kent in mid-July 2003.  While Dr Davenport Kent diagnosed plaintiff with a recurrent major depressive disorder, she opined that her depression seemed to be "somewhat moderate in nature," that her intellectual functioning was "generally intact," that her stream of mental activity was "fluid and intact," and that her mental status examination was "largely preserved." Tr. 1019-20.  In terms of functional ability, Dr. Davenport Kent concluded in relevant part as follows:

> Ms. Nicolet may be able to complete some simple and repetitive tasks and should be able to do some detailed and complex tasks.  The only inhabitation to this would be depressed mood, motivation and sleepiness.  This may be due, in part, to multiple medications which may be sedating in nature.
>
> Ms. Nicolet may have some difficulty with coworkers and the public. . . . She may have some difficulty being supervised by a superior and would do better in a job in which she has more autonomy, given her years of experience on the job.
>
> Ms. Nicolet should be able to attend work on a daily basis from a psychiatric point of view. . . .
>
> Ms. Nicolet's workday and workweek would be interrupted by some minor difficulty in memory.  However, she is an intelligent woman who should be able to compensate for this discrepancy.
>
> This woman's primary difficulties lie in the realm of physical pain, multiple medical problems and multiple medications. . . . Unfortunately, her multiple medical problems perpetuate her depressed mood, and the depressed mood perpetuates disorders such as fibromyalgia.  Because of this interaction, her physical abilities may be more limiting than they would be in the absence of depression.

Tr. 1021.

The ALJ stated in his decision that he gave "significant weight" to Dr. Davenport Kent's opinion that plaintiff "would do better in a situation where she was quite independent and could rely on her past office work experience," because it was "consistent with the other medical evidence that shows" she had "no severe level cognitive or attention deficits," but did have "some moderate but not marked limitations [in] dealing with other people." Tr. 749.  Plaintiff does not challenge this finding, but does argue the ALJ erred in failing to give any reason for not adopting Dr. Davenport Kent's other findings that her depressed mood, motivation and sleepiness would interfere with her ability to complete simple, repetitive and detailed tasks, that her depressed mood would perpetuate her physical problems, and that her workday and workweek would be interrupted by some minor difficulty in memory.

The undersigned agrees the ALJ erred in failing to provide any reason why he did not also adopt the other limitations found by Dr. Davenport Kent and noted by plaintiff. To reject the findings or opinion of an examining psychiatrist, the ALJ at the very least was required to provide specific and legitimate reasons for doing so. The ALJ's failure in this case to provide any reasons for rejecting the other mental functional limitations found by Dr. Davenport Kent clearly falls far short of this requirement.

B.   Dr. Eather and Dr. Comrie

In early August 2003, Bruce Eather, Ph.D., and Matthew Comrie, Psy.D., completed a psychiatric review technique form, in which they diagnosed plaintiff with a major depressive disorder, resulting in moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. Tr. 1036, 1043. At the same time, Drs. Eather and Comrie completed a mental residual functional capacity assessment form, in which they further found plaintiff to be moderately limited in her ability to: sustain an ordinary routine without special supervision; complete a normal workday and workweek; perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers. Tr. 1030-31.

The ALJ stated in his decision that because the moderate social functioning limitations Dr. Eather noted in the psychiatric review technique form were "consistent with the rest of the medical evidence," he gave that part of his opinion "significant weight." Tr. 749. In addition, the ALJ declined to "give much weight" to that portion of the psychiatric review technique form in which it was noted that plaintiff had moderate limitations in the areas of memory and concentration, because he found "no objective evidence" plaintiff had any memory or concentration problems. Id. As plaintiff points out, however, the ALJ gave no reasons for rejecting the other more specific limitations Dr. Eather noted in the mental residual functional capacity assessment form, and, indeed, the ALJ did not even mention that form in his decision. His failure to do so was error as well. See Vincent, 739 F.3d at 1394-95 (ALJ must explain why significant probative evidence has been rejected).

III.   The ALJ's Step Three Analysis Was Proper

At step three of the evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

1    If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.

2    The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the

3    Listings. Tacket, 180 F.3d at 1098.

4         A mental or physical impairment "must result from anatomical, physiological, or psychological

5    abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

6    C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs, symptoms,

7    and laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific

8    findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

9    An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs,

10   and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

11   impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

12        On the issue of whether plaintiff's physical impairments met or equaled the criteria of any of the

13   impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 (musculoskeletal system), the ALJ

14   found as follows:

15        The claimant's degenerative disc disease and epicondylitis symptoms do not meet or
          equal the symptoms required for any medical listing.  The claimant does not have motor
16        loss or sensory or reflex loss, as required by medical listing 1.04.  The claimant's
          bilateral degenerative joint disease of the knees does not prevent her from ambulating
17        effectively or from performing movements effectively, as defined in 1.00B2b or
          1.00B2c, thus the claimant does not meet for equal medical listing listing 1.02, major
18        dysfunction of a joint.

19   Tr. 747.  The undersigned finds the ALJ's determination on this issue to be supported by the substantial

20   evidence in the record.

21        Plaintiff argues the evidence in the record shows that she suffers from spinal stenosis, manifested by

22   chronic non-radicular and radicular pain, weakness and the need to use a cane to ambulate.  This, she

23   asserts, satisfies the requirements of Listing 1.04C.  That particular Listing provides:

24        1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
          stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
25        resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
          With: . . .
26
          C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on
27        appropriate medically acceptable imaging, manifested by chronic nonradicular pain and
          weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.
28
     20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04C.  The phrase "inability to ambulate effectively" in turn

REPORT AND RECOMMENDATION
Page - 10

is defined in relevant part as follows:

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J)[3] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00B2b.

The undersigned finds plaintiff's argument to be wholly unpersuasive.  Plaintiff focuses primarily on her use of a cane, and repeated reference by her medical providers that she uses such an assistive device. Nowhere in the record, however, is there any documentation that she has been proscribed a cane by any of her health care providers or that use of a cane is medically indicated.  In addition, the weight of the medical evidence in the record clearly shows that plaintiff has been able to ambulate and perform movements much more effectively than she is claiming.

In early January and early March 2000, for example, plaintiff was able to heel and toe walk without problems and her gait was normal. Tr. 334, 336, 364.  During a physical examination performed in early May 2000, the following observations were made by the examining physicians:

One is very impressed in terms of the claimant's hypermobility.  She literally will jump on the examination table and rotate with ease, and subsequently she will assume the sitting position and then again the standing position without restriction.

Tr. 231.  Plaintiff also was noted to be able to heel and toe walk adequately and to "carry out routine tandem ambulation without instability." Tr. 231, 233.  On knee flexion and extension and straight leg raise

[3]Section 1.00J reads in relevant part: "When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, . . . [t]he medical basis for the use of any assistive device (e.g., instability, weakness) should be documented." 20 C.F.R. Part 404, Subpart P, Appendix 1, §1.00J4.

testing, which plaintiff was able to do "actively and with facility," she expressly stated: "'See how mobile I am?,'" and reported she had been "mobile like this for many years." Tr. 231.  The following concluding remarks concerning plaintiff's movement and flexibility also was provided:

> The examiner was pleasantly impressed with the flexibility of her exam, inasmuch as she literally jumped on the examination table and was able to perform straight leg raising on the right and left vigorously without restriction.

Tr. 234.

In late October 2000, it was noted that plaintiff used a cane, but she was observed to be "walking fairly normally." Tr. 426.  Although plaintiff was seen to be "walking with a considerable limp" in early February 2001 (Tr. 519), her gait and heel and toe walking again were largely intact by late December 2001 (Tr. 579).  In late September 2002, she was noted to be "[a]mbulating independently" and able to get on and off the examining table "without assistance," and the examination of her lower extremities at that time was completely normal. Tr. 609.  She exhibited a "slight" limp in late February, 2003, and again in mid-July 2003. Tr. 972, 1095.  However, she had no difficulty rising on her heels and toes. Tr. 1095.

Two examining physicians have noted limitations due to reduced mobility because of pain. Tr. 585, 963.  However, in early December 2003, plaintiff was observed being able to "ambulate unassisted," even though she had a "slight" right limp and list. Tr. 1122.  In early February 2004, her gait was normal, and she was "able to easily ambulate about the room." Tr. 1119.  In March 2004, once more plaintiff was able to heel and toe walk (Tr. 1117), and she reported having "little to no leg pain" and walking "about a mile each day" to deliver papers in her building in late April 2004 (Tr. 1118).

Lastly, plaintiff argues the ALJ should have considered the extent to which her obesity affected her condition with respect to the issue of whether or not the criteria of Listing 1.04C were met here.  However, plaintiff points to no medical evidence, nor does a review of the record reveal any, that her obesity caused any work-related limitations.  Plaintiff may not merely claim her obesity causes work-related limitations, without coming forth with proper evidence concerning those limitations.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of a disability).  As such, the ALJ did not err in finding none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00, including § 1.04C.

IV.    The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Here, the ALJ discounted plaintiff's credibility for the following reasons:

> The claimant's allegations of completely disabling symptoms are not consistent with the objective medical evidence or with her own description of her routine activities. The main issue in this decision is the extent of the claimant's hand impairments. Her representative alleges that [the] claimant can only use her hands for 30 minutes per day. As discussed above, the objective medical record shows that the claimant has some cervical spine problems and epicondylitis (Exhibit B-1F, pgs. 17 to 21). The treatment for this focused on the claimant's shoulder. There was no evidence that the hand or wrist was involved. This shoulder problem would not affect the jobs that the vocational expert identified. In addition, the record shows that the claimant regularly does some hand intensive activities, such as playing cards, cooking a lot, driving her friends around, using her computer to type documents, doing dishes and babysitting and cleaning her daughter's house every Saturday (Exhibit B-28F, pg. 19). The record is full of the claimant's various complaints and with descriptions of her ongoing disputes with her daughter, but there is no mention anywhere of any intention to return to work. The claimant is retired and intends to stay that way and apparently has no motivation to do anything differently. This is overriding and does not help her credibility. For all of these reasons I do not find the claimant's allegations of disabling level symptoms to be credible.

1  Tr. 750.

2          Plaintiff primarily challenges the ALJ's findings concerning her reported activities of daily living.

3  She argues she is only able to perform her chores on a limited basis, and must frequently take breaks

4  because she is unable to engage in prolonged sitting and standing.  Plaintiff further argues the longitudinal

5  history of the record clearly shows she experiences back, shoulder and arm pain, has difficulty both with

6  social interaction and memory, and gets easily distracted.  Thus, plaintiff asserts, the activities in which she

7  does engage are not inconsistent with a finding of disability.

8          The undersigned, however, finds the ALJ did not err in discounting plaintiff's credibility because of

9  the kind and nature of her activities of daily living.  To determine whether a claimant's symptom testimony

10  is credible, the ALJ may consider his or her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may

11  be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores

12  or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly

13  incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily

14  transferable to a work environment." Id.

15          The record contains sufficient evidence to show plaintiff may not be as limited in her activities of

16  daily living as she claims.  For example, in late March 2000, plaintiff reported that although she had some

17  pain with vacuuming and sweeping, she was "able to do all of her household chores." Tr. 237.  She further

18  reported that she was "independent" in her shopping activities, and liked to read and cook for recreation. Id.

19  In late August 2000, plaintiff stated that she could "walk for at least a half mile" and could "lift and carry

20  quite a bit." Tr. 387.  She stated that she lead "an active and busy life," staying "up until 2:00 or 3:00 in the

21  morning" working three to four hours each day on her computer and spending another several hours each

22  day reading. Tr. 390.

23          Plaintiff also stated she prepared lunch and made "a three-course dinner every evening," picked up

24  and took care of her three grandchildren, "making sure they eat and have their bath," stopped at the grocery

25  store "on a daily basis," and took care of the cleaning. Id.  One examining psychiatrist opined that her

26  activities of daily living were "extremely adaptive" and that she did them well. Tr. 391.  Another medical

27  source found them to be "basically intact." Tr. 393.  Other medical sources in the record have come to

28  similar conclusions. See Tr. 441, 1032, 1043.  In late October 2000, plaintiff indicated that she had little

time for socializing, because she was "taking care of the children," but that she liked to read, cook and volunteer at church. Tr. 421-22. She further reported that she had no problems with her activities of daily living, and even enjoyed doing the "day-to-day shopping." Id.

In late January, 2001, and again in late May 2001, plaintiff reported that she provided child care to her daughter's three children, including two who had been diagnosed with ADHD. Tr. 466, 486. In mid-January 2002, plaintiff reported having to cook for them. Tr. 706. In late February 2002, she stated that she worked as a babysitter for her daughter. Tr. 674. In early June 2002, plaintiff reported being active with her hobby of baking and cooking. Tr. 694. In early August 2002, she reported working twenty hours each week doing child supervision and meal preparation for her daughter. Tr. 672.

In late September and early October 2002, plaintiff reported plans to cook a dinner once a month for the other residents at the facility where she was living and that she cared for her three grandchildren three times per week. Tr. 686-87. In mid-October 2002, she stated that she had been playing cards with the other tenants and planned to do more cooking at the facility. Tr. 684. In early and mid-November 2002, plaintiff said she was "enjoying recreation and cooking for the facility" and was "taking part and offering her talents there." Tr. 682-83. Later that month, plaintiff reported that she enjoyed cooking a Thanksgiving Day dinner for the residents and had been "busy with new activities." Tr. 670.

In early July 2003, plaintiff reported that she was "staying active" at her facility and "getting out," not isolating. Tr. 1180. In mid-July 2003, she reported that although the pace of her day was slow, she frequently read to a visually impaired friend, worked on her computer, read, and cooked dinner. Tr. 1018. In late September 2003, plaintiff stated that she would "be cooking holiday dinners" for her facility, and was "still involved with delivering papers." Tr. 1182.

In late January 2004, plaintiff still appeared "to be active and busy" at her facility and assisting with at least one of her grandchildren. Tr. 1186. In early March 2004, she stated that she drove more elderly residents of her apartment complex to their appointments, and sought "to busy herself in her building and provide support" for those residents. Tr. 1064-65. While plaintiff again noted difficulties with fatigue and a need to take frequent breaks, she reported being able to perform her own finances, chores, shopping, and most cleaning tasks. Tr. 1065. As noted above, plaintiff reported in early April 2004, that she walked "about a mile each day" delivering papers in her building. Tr. 1118.

Given the above evidence, the ALJ was not remiss in finding the activities plaintiff reported that she engaged in were not consistent with her allegations of total disability.  The other reasons provided by the ALJ for discounting plaintiff's credibility, furthermore, were sufficient as well.  As discussed above, the ALJ did not err in finding her alleged hand impairment to be non-severe.  As such, he also did not err in discounting her allegation that she could use her hands for only thirty minutes per day. See Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent with clinical observations can satisfy clear and convincing requirement).

In addition, the record appears to support the ALJ's determination to discount plaintiff's credibility in part due to her lack of motivation to return to work.  An ALJ may consider motivation and the issue of secondary gain in rejecting symptom testimony. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).  While it is true, as plaintiff asserts, that there is no evidence in the record of actual malingering, other evidence indicates the absence of a desire to continue working.

In December 30, 1997, for example, although prior to her alleged onset date of disability, plaintiff reported that she considered herself to be "marginally employable," and that she wanted to be "'certified as disabled' for her to feel less uncertain as to her immediate future." Tr. 416.  While plaintiff did express a desire to return to the workforce in early May 2001, the mental health provider to whom she reported this sensed that she was "ambivalent about this," and suspected that as long as she felt useful and appreciated, she "would prefer to take care of the grandchildren." Tr. 466.

V.     The ALJ Erred in Evaluating the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

1   "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

2        Plaintiff argues the ALJ erred in failing to consider the written statements of both her daughter and
3   her mental health therapist contained in the record.  The undersigned agrees.  While the standards for not
4   adopting the statements of lay witnesses are less stringent than that for statements made by a claimant, the
5   ALJ must provide at least some reason for his failure to do so.  Here, the ALJ provided so such reason.  As
6   such, he erred.

7        Defendant asserts plaintiff's daughter merely repeated her mother's complaints and provided no
8   probative evidence.  The Commissioner's own regulations though require consideration of "observations by
9   non-medical sources as to how an impairment affects a claimant's ability to work." Sprague v. Bowen, 812
10  F.2d 1226, 1232 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)).  Further, "[d]escriptions by friends and
11  family members in a position to observe a claimant's symptoms and daily activities have routinely been
12  treated as competent evidence." Id.

13       The mere fact that a lay witness's observations may echo those of the claimant is not a proper basis
14  for failing to consider those observations.  Otherwise, a claimant would be severely hampered in his or her
15  ability to present lay witness evidence favorable to them.  Defendant further argues that because the ALJ
16  rejected plaintiff's allegations of memory and concentration problems based in part on the reports of her
17  mental health therapist, the ALJ did not have to provide any specific reasons for rejecting those reports.
18  The undersigned finds this reasoning to be unpersuasive and contrary to the rules regarding consideration of
19  lay witness evidence in this circuit.  That is, as explained above, while the ALJ's reasons need only be
20  germane, he must provide at least some relevant reason.  He did not do so here.

21  VI.     The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

22       If a disability determination "cannot be made on the basis of medical factors alone at step three of
23  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and
24  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A
25  claimant's residual functional capacity assessment is used at step four to determine whether he or she can do
26  his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus
27  is what the claimant "can still do despite his or her limitations." Id.

28       A claimant's residual functional capacity is the maximum amount of work the claimant is able to

perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

[T]he claimant retains the residual functional capacity to lift and carry 20 lbs. occasionally and is able to lift and carry 10 lbs. frequently.  The claimant cannot do lifting for more than 2 hours in an 8-hour workday.  The claimant is able to stand and or walk for 20 to 30 minutes at a time without sitting, for a total of 2 hours in an 8-hour workday.  The claimant is able to sit, for no more than 2 hours at a time, for a total of 6 hours in an 8-hour workday.  The claimant is limited to work that does not require repetitive use of the right shoulder.  The claimant is limited to work that requires only short cycle contact with co-workers.

Tr. 750.  Plaintiff argues the above residual functional capacity assessment did not take into account all of her limitations.  The undersigned agrees that the ALJ failed to properly consider all of plaintiff's potential limitations in assessing her residual functional capacity.

A.   Need to Alternate Sitting and Standing

Plaintiff first asserts the ALJ's determination that she would be able to sit for up to six hours in an eight-hour workday did not take into consideration her need to alternate between sitting and standing.  The ALJ, however, expressly found that plaintiff could stand and/or walk for only twenty to thirty minutes at a time without sitting for a total of two hours in an eight-hour workday, and that she could sit for no more than two hours at any one time.  Thus, while it is true the ALJ found plaintiff capable of sitting for a total of six hours in an eight-hour workday, he clearly found she would not be able to do so all at one time.  The limitations he placed on her ability to sit, stand and walk, therefore, necessarily contemplate the necessity of alternating between sitting and standing.

B.   Manipulative and Environmental Limitations

Plaintiff also argues the ALJ did not consider any manipulative or environmental limitations in his assessment of her residual functional capacity.  As discussed above, however, the ALJ properly found that plaintiff did not have a severe hand impairment.  Also as discussed above, the record is essentially devoid of any medical documentation of work-related limitations due to a hand impairment.  As such, the ALJ did not

1    err in declining to include any such limitations.  Plaintiff further asserts the ALJ should have included other

2    limitations due to her asthma.  This assertion has more merit.

3          Except for finding that plaintiff's asthma did not meet or equal the criteria of any impairment listed

4    in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 748), the ALJ provided little discussion in his decision

5    regarding that impairment.  Although medical evidence in the record indicates her asthma achieved some

6    measure of stability and control, two medical sources found she had significant environmental limitations

7    due at least in part to that impairment.  See Tr. 450-51, 608, 1051, 1099, 1102, 1107.  Thus, for example, it

8    was felt that plaintiff should avoid all exposure to: extreme cold, vibration, humidity, hazards, and fumes,

9    odors, dust, gases, poor ventilation, and the like. Tr. 450, 1051.  It seems the ALJ did not consider these

10   opined limitations.

11          C.    Mental Functional Limitations

12         Plaintiff argues the ALJ further failed to properly consider all of the mental functional limitations

13   found by Dr. Davenport Kent and Dr. Eather.  The undersigned agrees.  As discussed above, the ALJ did

14   err in evaluating the opinions of these two medical sources.  As such, the ALJ necessarily also failed to

15   properly consider whether the additional limitations noted above found by Drs. Davenport Kent and Eather

16   should have been included in the assessment of plaintiff's residual functional capacity.

17         Plaintiff also asserts that the ALJ erred in not including findings made by Daniel M. Neims, Psy.D.,

18   in early March 2004, that she demonstrated some patterns of fatigue and diminished instructional recall

19   during the course of testing. Tr. 1065.  Dr. Neims, however, provided no opinion as to how these testing

20   results affected her ability to work.  Accordingly, the undersigned finds the ALJ did not necessarily err in

21   failing to include any mention of these findings in the residual functional capacity assessment.

22         Plaintiff next argues the ALJ erred in failing to include marked to severe limitations found by Dr.

23   Irene R. Mazer.  Specifically, Dr. Mazer, who evaluated plaintiff on two occasions, found in late February

24   2003, that she was severely limited in her ability to respond appropriately to and tolerate the pressures and

25   expectations of a normal work setting. Tr. 966.  Dr. Mazer further found plaintiff markedly limited in her

26   ability to relate appropriately to co-workers and supervisors and interact appropriately in public contacts.

27   Id.  The ALJ declined to give much weight to these findings for the following reasons:

28          Dr. Maz[er] stated that the claimant had multiple marked level mental limitations, most
           of which related to the ability to get along with others, but the doctor did not give any

REPORT AND RECOMMENDATION
Page - 19

basis for these conclusions, other than the claimant's own reports (Exhibit B-6F).  This part of Dr. Maz[er]'s opinion is not consistent with the claimant's own description of her daily activities, which shows that although the claimant does have difficulty getting along with others, she is still able to care for children, cook for others and to provide transportation for people.

Tr. 748.  The undersigned finds no error here.

While Dr. Mazer did conduct a prior comprehensive evaluation of plaintiff in late October 2000 (Tr. 419-24), it does appear the opinion she provided in late February 2003, was based largely on plaintiff's own self-report.  Because, again as discussed above, the ALJ properly discounted plaintiff's credibility, he was not necessarily remiss in discounting Dr. Mazer's findings for this reason.  See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan, 169 F.3d at 601 (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where they have been properly discounted).  Thus, while it may be questionable to reject the opinion of a mental health professional solely because it was based in part on the claimant's own reported history, here, Dr. Mazer relied almost solely on plaintiff's statements.

The undersigned does agree, however, that the ALJ erred in not considering the statements of the lay witnesses in the record in assessing plaintiff's residual functional capacity.  As discussed above, the ALJ erred in failing to provide any reasons for not adopting their written statements.  Plaintiff argues the ALJ should have considered their observations of plaintiff regarding her mental functional limitations. Because, given the ALJ's error in evaluating the lay witness statements, it cannot be said that the ALJ also properly excluded their observations from the assessment of plaintiff's residual functional capacity, or that he even considered them in making that assessment.

D.    The ALJ's Finding Regarding Light Work

In the "Findings" section of his decision, the ALJ again set forth the specific residual functional capacity assessment noted above as finding number 6, and then at finding number 11 stated that plaintiff had the residual functional capacity to performed a significant range of light work. Tr. 752-53.  Plaintiff challenges the ALJ's statement that the residual functional capacity assessment he provided constitutes light work.  The Social Security Regulations define "light work" as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be

very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); see also Social Security Ruling ("SSR") 83-10 (full range of light work requires standing or walking, off and on, for total of approximately 6 hours of 8-hour workday).

Clearly, plaintiff's limitation to standing and walking no more than a total of two hours in an eight-hour workday precludes her from being able to perform the full range of light work.  On the other hand, the lifting and carrying limitations which the ALJ placed on plaintiff are clearly greater than those imposed by a restriction to sedentary work. See 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). Because the ALJ did not define what he meant by a significant range of light work, it is not clear whether that designation or one that more closely approximates sedentary-type work is appropriate.  This, therefore, should be an additional issue to be resolved by the Commissioner on remand.

VII.     The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

2001).

Here, the ALJ posed a hypothetical question to the ALJ that was substantially similar to the residual functional capacity assessment he provided in his decision. Tr. 1255-56. Plaintiff argues that hypothetical question was insufficient, because it did not include all of her exertional and non-exertional limitations in light of the ALJ's errors in assessing her residual functional capacity. The undersigned agrees. Given the errors the ALJ committed in making that assessment, it cannot be said that the hypothetical question that he posed to the vocational expert accurately depicts all of plaintiff's limitations.

Plaintiff further argues the ALJ did not properly identify in his decision all of her transferable skills in determining that she could make a transition to other semi-skilled work existing in significant numbers in the national economy. When a decision involves the transferability of skills, the following requirements must be met:

> . . . When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision. Findings should be supported with appropriate documentation.
> When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision. Evidence that these specific skilled or semiskilled jobs exist in significant numbers in the national economy should be included (the regulations take administrative notice only of the existence of unskilled sedentary, light, and medium jobs in the national economy). This evidence may be VS [vocational specialist] statements based on expert personal knowledge or substantiation by information contained in the publications listed in regulations sections 404.1566(d) and 416.966(d). It is important that these findings be made at all levels of adjudication to clearly establish the basis for the determination or decision for the claimant and for a reviewing body including a Federal district court.

SSR 82-41, 1982 WL 31389 *7. It appears the ALJ did not comply with these requirements.

It is true that the ALJ asked the vocational expert regarding any skills plaintiff acquired that were transferable to other work, and that the vocational expert identified some skills that were transferable to other specific jobs. Tr. 1257-61. The ALJ set forth the following findings in his decision with respect to the vocational expert's testimony:

> The Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined. The vocational expert testified that assuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to other work. The vocational expert testified that given all of these factors the claimant could work as an appointment clerk, DOT#237.367-010, sedentary, semi-skilled, svp 3, with 10,000 such jobs in Washington State and 350,000 jobs in the national economy; and as a data entry clerk, DOT#203.582-054, sedentary, semi-skilled, svp 4, with 8,000 jobs in Washington State,

1    and 375,000 jobs in the national economy.

2    Tr. 751-52.  As can be seen, while the ALJ did identify the specific jobs he found plaintiff to be capable of

3    performing, he made no specific findings with respect to plaintiff's transferable skills.  Indeed, no mention of

4    the term "transferrable skills" is made anywhere in the decision.  This was error.

5          Lastly, plaintiff argues the ALJ should have found her disabled pursuant to Grid Rule 201.06.  That

6    Grid Rule mandates a finding of disability, however, only if the claimant has no skills that are transferable.

7    20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.06.  Here, while, as discussed above, the ALJ did err in

8    failing to set forth his specific findings regarding the transferability of skills in his decision, it is not at all

9    clear plaintiff has no transferable skills.  Indeed, the opposite appears to be true, as the vocational expert

10   clearly testified that plaintiff had transferable skills from her past work.  Whether those skills would enable

11   her to perform other work remains to be seen on remand.

12   VIII.   This Matter Should Be Remanded for Further Administrative Proceedings

13         The Court may remand this case "either for additional evidence and findings or to award benefits."

14   Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

15   except in rare circumstances, is to remand to the agency for additional investigation or explanation."

16   Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

17   which it is clear from the record that the claimant is unable to perform gainful employment in the national

18   economy," that "remand for an immediate award of benefits is appropriate."  Id.

19         Benefits may be awarded where "the record has been fully developed" and "further administrative

20   proceedings would serve no useful purpose."  Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

21   1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

22              (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
             evidence, (2) there are no outstanding issues that must be resolved before a
23           determination of disability can be made, and (3) it is clear from the record that the ALJ
             would be required to find the claimant disabled were such evidence credited.

24
25   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

26   issues remain with respect to plaintiff's residual functional capacity and whether she is capable of

27   performing other work existing in significant numbers in the national economy, this matter should be

28   remanded to the Commissioner for further administrative proceedings.

           Plaintiff argues that because the ALJ failed to provide adequate reasons for not adopting all of the

REPORT AND RECOMMENDATION
Page - 23

1   mental functional limitations found by Dr. Davenport Kent and Dr. Eather, their opinions must be credited

2   as a matter of law.  It is true that where the ALJ has failed to provide adequate reasons for rejecting the

3   opinion of an examining physician, that opinion generally is credited "as a matter of law." <u>Lester</u>, 81 F.3d at

4   834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on the

5   crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the <u>Smolen</u> test

6   will not be found to have been met.  <u>Bunnell v. Barnhart</u>, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further,

7   "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by

8   improperly discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings

9   rather than payment of benefits." <u>Bunnell</u>, 336 F.3d at 1116.

10          In this case, it is not clear that the ALJ would be required to adopt all of the limitations found by Dr.

11  Davenport Kent and Dr. Eather.  The medical evidence in the record is mixed at best with respect to

12  plaintiff's mental impairments and functional limitations.  Indeed, at least three other medical sources in the

13  record, including an examining psychiatrist, found she had no severe mental impairment. <u>See</u> Tr. 387-91,

14  392-400, 431-42.  Even Drs. Davenport Kent and Eather do not agree on the exact level of severity of

15  plaintiff's mental limitations.  Thus, for example, while Dr. Eather felt plaintiff was moderately limited in her

16  ability to complete a workday and workweek, Dr. Davenport Kent believed she "should be able to attend

17  work on a daily basis from a psychiatric point of view," and that her workday and workweek would be

18  interrupted only by "some minor difficulty in memory," but that she would be able to compensate for that

19  difficulty. Tr. 1021, 1031.  These issues need to be resolved on remand.

20          Finally, plaintiff requests that this matter be remanded to a different ALJ.  Although plaintiff does

21  not provide any specific reasons for this request, the undersigned notes that the ALJ in this case already has

22  had two opportunities to properly address this matter.  He has failed to do so each time.  Accordingly, on

23  remand, the Commissioner shall have this matter be considered by a different ALJ.

24                                               <u>CONCLUSION</u>

25          Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

26  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

27  further administrative proceedings in accordance with the findings contained herein.

28          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

the parties shall have ten (10) days from service of this Report and Recommendation to file written

REPORT AND RECOMMENDATION
Page - 24

objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 9, 2007**, as noted in the caption.

      DATED this 14th day of February, 2007.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 25